USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/5/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

             – v.–

YONG WANG,

                 Defendant.

**MEMORANDUM
OPINION & ORDER**

11 Cr. 730 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Defendant Yong Wang is charged with advertising child pornography in violation of 18 U.S.C. § 2251(d)(1), with receiving and distributing child pornography in violation of 18 U.S.C. § 2252A(a)(2)(B), and with reproducing child pornography for distribution in violation of 18 U.S.C. § 2252A(a)(3)(A).

        Wang has moved to suppress (1) his post-arrest statements and (2) evidence obtained as a result of his consent to agents assuming his online identity. Wang claims that his post-arrest statements were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and that his consent was not voluntary.

        Wang has also moved to dismiss Count One of the Indictment on the grounds that (1) it fails to state an offense; (2) Section 2251(d)(1) is "void for vagueness"; and (3) Section 2251(d)(1) is ambiguous as to the definition of "advertisement," and under the "rule of lenity," a charge brought under Section 2251(d)(1) must be dismissed.

        For the reasons stated below, Wang's motion to suppress will be granted as to post-arrest statements he made prior to the administration of Miranda warnings, but will otherwise be denied. Wang's motion to dismiss Count One will be denied.

## BACKGROUND

### I.  THE CHARGES AGAINST WANG

Count One of the Indictment charges Wang with advertising child pornography in violation of 18 U.S.C. § 2251(d)(1).  Count One's factual allegations include the following:

Between 2007 and June 2011, Wang "managed and operated at least 18 websites containing child pornography ('the Websites')."  (Indictment ¶ 1)  Wang "sold 'memberships' to the Websites to individuals who paid to view, post, and download graphic images of child pornography."  (Id.)  The Websites were in Chinese.  (Id.)

In order to access child pornography on the Websites, it was necessary "to (i) purchase a 'V.I.P. membership,' or (ii) acquire 'points' either by making monetary payments or by posting pornography, including child pornography, to the Websites."  (Id. ¶ 2)  Wang "oversaw memberships for the Websites and collected payments either directly or indirectly through associates who established accounts at banks in China, at Wang's behest."  (Id.)

One of Wang's websites – http://uudiguo.info – is entitled "'Empire of the Young and Innocent Fragrances,'" as translated from Chinese.  (Id. ¶ 3)  Links on the Websites "advertised and offered access to child pornography collected under descriptive titles, such as 'Young Young Empire,' 'Young Girl Beauty Photos Military Region,' 'Young Boy Movie Zone,' and 'Exclusive Quality Young Girl Photos Set.'"  (Indictment ¶ 3)

The "to wit" clause of Count One states that Wang "maintained and operated websites that contained advertisements for the display and reproduction of images of child pornography over the Internet."  (Indictment ¶ 5)

Counts Two and Three of the Indictment charge Wang with receipt and distribution of child pornography and reproduction of child pornography for distribution, respectively.

## II.   WANG'S AFFIDAVIT

In support of his motion to suppress, Wang submitted an affidavit alleging the following facts:  At 6:30 a.m. on June 23, 2011, federal agents entered his home.  (Wang Aff. ¶ 3)  Because he "did not know who they were," he hid in a closet.  (Id.)  "[W]ith guns drawn," the agents removed Wang from his closet and brought him to the living room.  (Id. ¶ 4)  One of the agents then told Wang, "we are not here for you, but want you to cooperate and tell us who is making the pictures and posting [them] on [the] web."  (Id. ¶ 5)

Wang asserts that "[t]he Federal Agents led [him] to believe that if [he] cooperated with the agents and gave them the information they requested[, he] would be released" and would not be arrested.  (Id. ¶ 6)  Accordingly, Wang provided a statement to the agents and consented to the agents assuming his online identity.  (Id.)

## III.   SUPPRESSION HEARING TESTIMONY

The Court conducted an evidentiary hearing concerning Wang's suppression motion on June 21, 2012 and October 25, 2012.  The Government called Special Agent Thomas Thompson of the Federal Bureau of Investigation's ("FBI") Internet Crimes Against Children Unit, who was involved in Wang's arrest and post-arrest questioning.  Wang did not testify and did not call any witnesses.  Agent Thompson testified to the following:

At approximately 6:05 a.m. on June 23, 2011, Agent Thompson, other FBI agents, and a translator arrived at Wang's residence in Flushing, Queens.  (June 21, 2012 Suppression Hearing Transcript ("June 21, 2012 Tr.") 7-8)  Agents had an arrest warrant for Wang and a

search warrant for his residence.  (<u>Id.</u> at 8)  Each agent was wearing either a vest or jacket bearing the FBI logo printed in large letters.  (<u>Id.</u> at 9, 19)  One of the agents knocked on the door of Wang's residence and "yelled out 'FBI, search warrant, open the door, 5H.'"  (<u>Id.</u> at 9)  Another agent repeated this statement in Chinese.  (<u>Id.</u>)  Someone opened the door to Wang's residence, and his parents, wife, and brother then left the apartment.  (<u>Id.</u>)

After Wang's family exited the apartment, a number of the agents entered the residence in order to conduct a "safety sweep" – <u>i.e.</u>, to look for weapons and to make sure that no one else was in the apartment.  (<u>Id.</u> at 9-10, 22)  After Agent Thompson entered the living room, he heard a "commotion" coming from Wang's bedroom.  (<u>Id.</u> at 10)  A short time later, two agents walked into the living room with Wang.  (<u>Id.</u> at 10, 23-25)  One of the agents advised Agent Thompson that Wang had been "hiding in his bedroom closet on a shelf approximately eight feet high, with clothes over him."  (<u>Id.</u> at 10)  The agent had been searching Wang's closet when he saw a foot, became startled, drew his gun, and yelled "[s]how me your hands."  (<u>Id.</u> at 25)

Agent Thompson then asked Wang "[w]hat were you doing, why were you hiding?"  (<u>Id.</u> at 10-11, 26-28)  Wang responded, "[w]hen I heard agents outside yell FBI, I knew I was in a lot of trouble, so I hid."  (<u>Id.</u> at 11)  This conversation took place in English.  (<u>Id.</u> at 11)

At approximately 6:15 a.m., Agent Thompson and Agent Linh Phung took Wang to his bedroom and began questioning him.  (<u>Id.</u> at 8, 11, 28-29, 31)  The questioning took place in English.  (<u>Id.</u> at 11)  Agent Thompson testified that he asked Wang if he spoke English and Wang stated that he did.  (<u>Id.</u>)  Agent Thompson advised Wang that a translator was present in the apartment, but Wang stated that he did not need translator.  (<u>Id.</u> at 11, 32-33)  Wang spoke

4

English clearly and never indicated that he was having any difficulty understanding the agents. (Id. at 11, 32, 47, 52)  Wang had a Facebook page that contained English, and a number of his emails were in English.  (Id. at 49-50)  Moreover, Wang had lived in the United States since 1999 and had attended Queens College.  (Id. at 49-50, 52)

Agent Thompson told Wang that the agents had a warrant for his arrest and a search warrant for the apartment, and that Wang faced child pornography charges.  (Id. at 11, 33) Agent Thompson told Wang that he knew Wang was operating a child pornography website, and that "[o]ne of our goals is to find out who is making these child pornography videos, and [that agents] would appreciate his cooperation."  (Id. at 33-34)  Agent Thompson told Wang that although the agents could not "make him any promises" as to whether "his cooperation will help or not help his case," agents would prepare a report that would be given to the prosecutor and the judge.  (Id. at 11-12, 35)  Agent Thompson also told Wang that cooperating "could help him down the line."  (Id. at 11, 35-37)

Shortly after entering Wang's bedroom, Agent Thompson verbally administered Miranda warnings to Wang.  At approximately 6:20 a.m., Thompson gave Wang a written FBI advice-of-rights form.  (Gx. 1; June 21, 2012 Tr. 12, 38-39, 43-45)  After Wang read the advice-of-rights form, Agent Thompson asked him if he understood it, and Wang responded that he did. (June 21, 2012 Tr. 12, 38-39, 43-45)  Agent Thompson then asked Wang if he was willing to sign the form and speak with agents.  Wang stated that he was willing to answer questions, and he signed the waiver form at approximately 6:21 a.m.  (Gx. 1; June 21, 2012 Tr. 12, 38-39, 43-45)

After Wang signed the advice-of-rights form, Agents Thompson and Phung began to interview Wang.  (June 21, 2012 Tr. 13)  Wang was not handcuffed during this interrogation.

(Id. at 14, 31, 41)  Agent Thompson again asked Wang, "[w]hat were you doing, why were you hiding[?]"  (Id. at 13)  Wang repeated that he "hid in the closet because when [he] heard the agents out[side] the door yell FBI, [he] knew [that he] was in a lot of trouble."  (Id.)  Agent Thompson again advised Wang that he knew Wang was operating a child pornography website, and told him that he was being arrested for distributing child pornography.  (Id.)

After Wang signed the advice-of-rights form, he told the agents that he could go online and show them the "uudiguo" website.  (Oct. 25, 2012 Suppression Hearing Transcript ("Oct. 25, 2012 Tr.") 7, 15)  Agent Thompson then told Wang that the agents wanted to take over his online accounts and asked Wang to sign a form entitled "Consent to Assume Online Presence."  (Gx. 2; Oct. 25, 2012 Tr. 7-8)  This form states, in part:

> I consent to the use of my online presence for any purpose relating to an official investigation by the above law enforcement authority, including (but not limited to) sending and receiving email or conducting any other electronic communications, accessing stored information, and using and disclosing such communications or information.  I understand and acknowledge that by signing the consent form, I relinquish all present and future claims to the use of these accounts.  I understand that law enforcement authorities will change the password(s) to this account so that I will no longer have access.

> I give this consent freely and voluntarily, without fear, threats, coercion, or promises of any kind.  I have been advised of my right to refuse to allow the assumption of my online presence, and I hereby voluntarily waive this right.

(Gx. 2)

Agent Thompson told Wang that if he signed the form, he would never have access to the accounts again.  (Oct. 25, 2012 Tr. 8)  Wang never indicated that he was having any trouble understanding Agent Thompson, who was speaking in English.  (Id.)  Neither Agent Thompson nor Agent Phung told Wang that he would be released if he signed the form.  (Id. at 8-9)  Wang read the form and then provided his user name and password for his desktop computer, for his Paypal account, for his email accounts, and for the server that hosted the

6

"uudiguo" website.  (Id. at 9; Gx. 2)  After providing this information, Wang signed the form.
(Oct. 25, 2012 Tr. 8)  He did not ask any questions about the form.  (Id. at 9)

   The interrogation of Wang inside his apartment ended at approximately 7:40 a.m.
(June 21, 2012 Tr. 14)  Agents Thompson and Phung then transported Wang to FBI offices.  (Id.)
Agents handcuffed him in the hallway of his apartment building before transporting him to FBI
offices.  (Id.)  During the trip, Wang asked the agents how they "found out about him."  Agent
Thompson told Wang that the investigation was the result of information provided by the
Chinese government.  (Id.)  Wang then asked if he would be deported to China; Agent
Thompson told him, "that's highly unlikely but that's way above my chain."  (Id.)  Wang also
asked the agents what would happen that day.  (Id. at 15)  Agent Thompson told Wang that the
agents' interview of him would continue at the FBI offices, that he would be fingerprinted and
photographed, that he would then be taken to the courthouse where the marshals would likely
fingerprint and photograph him again, and that he would then be presented to a judge who would
"set bail if you can get bail."  (Id. at 15, 45-46)

   After arriving at the FBI offices, Agents Thompson and Phung continued their
questioning of Wang.  (Id. at 14-15)  Wang admitted that he was the owner and operator of the
"uudiguo" website and that he was aware that the website contained child pornography.  (Id. at
15)  Wang told agents that he operated 70 websites, 18 of which contained child pornography.
(Id. at 15-16)  Wang estimated that five to ten percent of his profits came from child
pornography websites.  (Id. at 16)

   At approximately 10:20 a.m. – when the agents were questioning Wang about
how he was laundering profits from his websites – Wang requested a lawyer.  (Id. at 17)  The
agents immediately terminated the interview.  (Id.)

Agent Thompson testified that neither he nor Agent Phung ever told Wang that he would not be arrested or that he would be released if he cooperated with the FBI.  (Id. at 13, 17-18)  Agent Thompson likewise denied that he and Agent Phung told Wang that the FBI was not interested in him and simply wanted him to identify the individuals producing the child pornography.  (Id. at 17-18)

Agent Thompson also testified that the agents did not use any of the information Wang provided on the "Consent to Assume Online Presence" form because they had previously obtained search warrants that authorized them to access Wang's desktop computer, his Paypal account, his email accounts, and the "uudiguo" server.  (Oct. 25, 2012 Tr. 5-6, 10-15)

## DISCUSSION

### I.   WANG'S SUPPRESSION MOTION

Wang argues that his post-arrest statements, and his consent to agents assuming his online presence, were obtained in violation of Miranda:  "the Miranda waiver is invalid as well as [the] consent [permitting the agents to assume his online presence] based on the false statements and pressure placed upon [Wang] by the Federal Agents, as well as Involuntary under 18 U.S.C. § 3501."  (Greenberg Aff. ¶ 35)  Wang further contends that "[t]he statements by the Federal Agents were false and made solely with the intent to induce Mr. Wang to cooperate and make full admissions, knowing full well that the Federal Agents were there to arrest Mr. Wang and would use what he stated against him."  (Id. ¶ 36)

### A.   Applicable Law

In Miranda v. Arizona, the Supreme Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is

8

subjected to questioning. . . . [the following] [p]rocedural safeguards must be employed to

protect the privilege [against self-incrimination]":

> He must be warned prior to any questioning that he has the right to remain silent,
> that anything he says can be used against him in a court of law, that he has the
> right to the presence of an attorney, and that if he cannot afford an attorney one
> will be appointed for him prior to any questioning if he so desires.  Opportunity to
> exercise these rights must be afforded to him throughout the interrogation.  After
> such warnings have been given, and such opportunity afforded him, the individual
> may knowingly and intelligently waive these rights and agree to answer questions
> or make a statement.  But unless and until such warnings and waiver are
> demonstrated by the prosecution at trial, no evidence obtained as a result of
> interrogation can be used against him.

384 U.S. at 478-79.

"The purpose of the Miranda warning is to ensure that the person in custody has

sufficient knowledge of his or her constitutional rights relating to the interrogation and that any

waiver of such rights is knowing, intelligent, and voluntary."  United States v. Carter, 489 F.3d

528, 534 (2d Cir. 2007) (citing Miranda, 384 U.S. at 444-45).  Only unwarned statements made

in response to interrogation are subject to suppression, however.

"To prove a valid waiver, the government must show (1) that the relinquishment

of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the

right being waived and of the consequences of waiving that right."  United States v. Jaswal, 47

F.3d 539, 542 (2d Cir. 1995) (per curiam).  "Only if the totality of the circumstances 'reveals

both an uncoerced choice and the requisite level of comprehension may a court properly

conclude that the Miranda rights have been waived.'"  United States v. Male Juvenile, 121 F.3d

34, 40 (2d Cir. 1997) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  "A voluntary

relinquishment of a right occurs when the relinquishment is the 'product of a free and deliberate

choice rather than intimidation, coercion, or deception.'"  Id. at 41 (quoting Moran, 475 U.S. at

421).

"It has been recognized . . . that unfulfillable promises or certain other misrepresentations made to a suspect might render a confession involuntary because they overcome his desire to remain silent."  United States v. Gaines, 295 F.3d 293, 299 (2d Cir. 2002); see also United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995) ("Material misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will.").  However, as a general matter, "statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive."  Ruggles, 70 F.3d at 265; see also Jaswal, 47 F.3d at 542 ("Generally, promises of leniency will not render a confession involuntary."); Gaines, 295 F.3d at 299 (noting that "vague promises of leniency for cooperation are just one factor to be weighed in the overall calculus and generally will not, without more, warrant a finding of coercion").

"It is well settled that statements obtained during a police interrogation that are not preceded by Miranda warnings cannot typically be used by the prosecution in its case in chief."  United States v. Simmons, 661 F.3d 151, 155 (2d Cir. 2011) (citing Berghuis v. Thompkins, 130 S. Ct. 2250, 2260 (2010); Michigan v. Harvey, 494 U.S. 344, 350 (1990); United States v. Newton, 369 F.3d 659, 668 (2d Cir. 2004)).  "However . . . [the Second Circuit has] recognized that 'Miranda warnings need not precede questions reasonably prompted by a concern for the public safety or for the safety of the arresting officers for a suspect's answers to be admitted as evidence of his guilt.'"  Id. (quoting Newton, 369 F.3d at 677).  The Second Circuit has noted "two additional principles relevant to the public safety exception.  First, 'pre-Miranda questions, while framed spontaneously in dangerous situations, may not be investigatory in nature or designed solely to elicit testimonial evidence from a suspect.'  Second, '[the Second Circuit] expressly ha[s] not condoned the pre-Miranda questioning of suspects as a

routine matter.'" Id. (quoting United States v. Estrada, 430 F.3d 606, 612 (2d Cir. 2005)).

"Instead, recognizing the need for flexibility when genuine concerns of public safety exist,

application of the exception requires [a court] to examine the totality of the relevant

circumstances." Id. The public safety exception is "'a narrow exception to the Miranda rule.'"

Newton, 369 F.3d at 677 (quoting New York v. Quarles, 467 U.S. 649, 658-59 (1984)).

### B.   Wang's Post-Miranda Statements Will Not Be Suppressed

The Government has met its burden of establishing that Miranda warnings were

properly administered to Wang, and that he knowingly and voluntarily waived his rights.

Accordingly, Wang's motion to suppress his post-Miranda statements and the consent form will

be denied.

As an initial matter, while the Court has considered both Wang's affidavit and

Agent Thompson's testimony, the latter is entitled to more weight because it was subject to

cross-examination. See, e.g., United States v. Fuentes, No. 07 Cr. 329(SHS), 2007 WL 2319142,

at *4 (S.D.N.Y. Aug. 10, 2007) (crediting witness testimony over defendant's sworn statement

regarding whether he gave consent); United States v. Robles, 253 F. Supp. 2d 544, 549 n.14

(S.D.N.Y. 2002) (noting that courts "'give greater weight to [witness] testimony, which was

subject to cross examination, than to affidavits'") (quoting United States v. Gardner, 611 F.2d

770, 774 n.2 (9th Cir. 1980)); United States v. Juliano, No. 99 Cr. 1197(AGS), 2000 WL

1206745, at *3 n.1 (S.D.N.Y. Aug. 24, 2000) (affording less weight to defendant's affidavit,

because the court could not assess the defendant's credibility and the testimony of Government

witnesses was "forthright and truthful") (citing United States v. Frank, 8 F. Supp. 2d 284, 291

(S.D.N.Y. 1998)).

Here, although Wang does not dispute that <u>Miranda</u> warnings were administered and that he signed a <u>Miranda</u> waiver form, he contends that his waiver was involuntary. Wang claims that the agents told him "we are not here for you" (Wang Aff. ¶ 5), and that they led him to believe that if he cooperated and told them who was producing the child pornography, he would be released and would not be arrested. (<u>Id.</u> ¶ 6) These claims are contradicted by the evidence at the hearing. Agent Thompson denied telling Wang that he would not be arrested and would be released if he cooperated with the FBI, and Agent Thompson testified that he did not hear Agent Phung make any such statement. (June 21, 2012 Tr. 13, 17-18; Oct. 25, 2012 Tr. 8-9) Agent Thompson also denied that agents told Wang that the FBI was only interested in the individuals making the child pornography. (June 21, 2012 Tr. 17-18)

Moreover, Agent Thompson told Wang that the agents had an arrest warrant for him related to child pornography charges. (<u>Id.</u> at 11, 33) He also advised Wang that he would be fingerprinted and photographed at the FBI office and by the marshals, and that he would then be presented to a judge. (<u>Id.</u> at 14-15, 45-46) These statements and actions are completely inconsistent with Wang's claim that agents told him that he would not be arrested. That Wang asked the agents if he would be deported to China also tends to refute Wang's contention that he believed he would be released if he cooperated. (<u>Id.</u> at 14) The Court finds Agent Thompson's account of his questioning of Wang entirely credible.

Agent Thompson did acknowledge that he told Wang that one of the agents' goals was to determine who was producing the child pornography and that the agents "would appreciate his cooperation." (<u>Id.</u> at 11, 33) Wang argues that these statements "gave defendant the impression that the agents were not targeting <u>him</u> for investigation and prosecution, but were instead interested in information about the makers of the child pornography." (Def. Post-Hr'g

Br. 6)  As noted above, however, Agent Thompson explained to Wang that the agents had an arrest warrant for him and told him that he was being arrested for distributing child pornography. (June 21, 2012 Tr. 13)  He also told Wang that the agents could not "make him any promises" as to whether "his cooperation will help or not help his case."  (Id. at 11, 35-37)

Given these circumstances, Agent Thompson's statements about cooperation – including his remark that agents "would appreciate [Wang's] cooperation" – cannot be viewed as "improperly coercive."  See Ruggles, 70 F.3d at 265; see also Gaines, 295 F.3d at 299.  The evidence elicited at the suppression hearing demonstrates that the agents did not promise Wang leniency in exchange for his cooperation.

The evidence also demonstrates that Wang understood his rights.  Wang has never contended that he had any difficulty understanding the Miranda warnings or the consent form. Moreover, Wang told the agents that he understood English and, although he was advised that a translator was present in his apartment, he declined the assistance of a translator.  (June 21, 2012 Tr. 11, 32-33)  Wang also spoke unbroken English throughout the interview.  (Id. at 11, 32, 47) At no time during the interview did Wang indicate that he was having difficulty understanding the agents or that he was unable to read English.  (June 21, 2012 Tr. 47, 52; Oct. 25, 2012 Tr. 8) Wang also maintained a Facebook page on which he wrote comments in English and he attended college in the United States.  (June 21, 2012 Tr. 49-50, 52)  Finally, Wang's understanding of his rights is confirmed by his later request for an attorney, which led to the immediate termination of the interview.[1]  (Id. at 17)

---

[1]  Wang argues that "the law enforcement conduct must be considered in light of (a) the fact that defendant was a young man who had never been in trouble before and had never encountered the criminal justice system; (b) the environment of the interrogation – specifically, that it began with defendant surrounded by agents, only ten minutes after he had been yanked from his closet at gunpoint, and at a time of day when he had been sleeping and was likely to be disoriented.

With regard to the consent form, Agent Thompson testified that Wang provided

the information on it and signed it after he signed the <u>Miranda</u> waiver form.  (Oct. 25, 2012 Tr.

15)  The credible evidence demonstrates that Wang read and understood the consent form, and

---

Obviously, the defendant's faculties could not be expected to be at their highest at such a time."
(Def. Post-Hearing Br. 7)  The Court has considered, as it is required to do, the "'the totality of
all the surrounding circumstances, including the accused's characteristics, the conditions of
interrogation, and the conduct of law enforcement officials.'"  <u>United States v. Lynch</u>, 92 F.3d
62, 65 (2d Cir. 1996) (quoting <u>United States v. Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991)).
Nothing about the agents' conduct, the conditions of the interrogation, or Wang's characteristics
– viewed in their entirety – suggests that his waiver was involuntary.  The record  indicates that
Wang was 26 years old at the time of his arrest.  (<u>See</u> Govt. Opp. Br., Ex. 3)  Defendants younger
than Wang have been deemed capable of voluntarily waiving their constitutional rights.  <u>See,</u>
<u>e.g.</u>, <u>Green v. Scully</u>, 850 F.2d 894, 902 (2d Cir. 1988) (finding that "nothing revealed in the
characteristics of the accused or the conditions of interrogation . . . suggests an overbearing of
[petitioner's] will," where petitioner was 23 years old at the time of the interrogation and had
attended school until tenth grade); <u>Brodenburg v. Conway</u>, No. 05-cv-01119-ADS, 2007 WL
2295812, at *17 (E.D.N.Y. Aug. 4, 2007) ("[T]he Court finds that although the Petitioner was 20
years old, had been awake for 24 hours and allegedly had limited experience with law
enforcement, the confession was voluntary."); <u>Huntley v. Superintendent of Southport Corr.</u>
<u>Facility</u>, No. 9:00CV191(DNH), 2007 WL 319846, at *12 (N.D.N.Y. Jan. 30, 2007)
("[P]etitioner's experience and background do not indicate that he was susceptible to being
coerced.  At the time he was questioned by [the law enforcement official], [petitioner] was
nineteen years old, had attended school through the twelfth grade, and had no trouble reading
and writing English."); <u>United States v. Javier</u>, 882 F. Supp. 266, 270 (D. Conn. 1995) ("Many
of [defendant's] personal characteristics also weigh in favor of finding that his consent was
voluntarily given.  He is twenty-years-old and has had some high school education.  Although he
is not native born, he has lived in this country for approximately four years.").  Moreover, "'[t]he
law is clear that a person's age . . . , while relevant to an analysis of whether police behavior was
coercive, will not suffice to show involuntariness if the record as a whole indicates that the
person understood his rights and freely chose to waive them.'"  <u>United States v. Mason</u>, 660 F.
Supp. 2d 479, 487 (W.D.N.Y. 2009) (quoting <u>United States v. Smith</u>, 1 F. Supp. 2d 206, 215
(W.D.N.Y. 1998)); <u>see also</u> <u>Williams v. Girdich</u>, No. 04 CV 1286(RJD), 2008 WL 2686858, at
*5 (E.D.N.Y. July 8, 2008) ("[I]t is well established that petitioner's age alone does not render
him incompetent to make an effective <u>Miranda</u> waiver.") (citing <u>Fare v. Michael C</u>, 442 U.S.
707, 727-28 (1979); <u>United States v. Burrous</u>, 147 F.3d 111, 116-17 (2d Cir. 1998)).  Wang
attended college in the United States (June 21, 2012 Tr. 52) and there is no evidence that he
suffers from any mental impairment.  As discussed above, there is no evidence of coercion,
threats, or false or misleading statements on the agents' part.  Wang was advised of his <u>Miranda</u>
rights both verbally and in writing and, as discussed above, there is no evidence that Wang did
not understand his rights.  There is likewise no evidence that Wang complained at any point
about the conditions of the interrogation.  Indeed, agents did not handcuff Wang until it came
time to leave the apartment.  (<u>Id.</u> at 14)

that he executed it freely and knowingly.  The Government has thus met its burden of demonstrating that Wang's execution of the consent form was knowing and voluntary.  This appears to be a moot point, however.  Agent Thompson testified that agents did not obtain any new information as a result of the consent form because they already had search warrants for Wang's residence, email accounts, and servers.  (Id. at 5-6, 10-15)  The Government has further represented that it does not intend to use against Wang any evidence that was obtained as a result of his execution of the consent form.  (Id. at 16)

In sum, the Court finds that Wang's waiver – as to both the post-arrest statements and the consent form – was voluntary and that he "had a full awareness of the right[s] being waived and of the consequences of waiving [those] right[s]."  Jaswal, 47 F.3d at 542.  Wang's motion to suppress his post-Miranda statements and any evidence obtained as a result of his consent to agents assuming his online identity will be denied.

### C.   Wang's Pre-Miranda Statement Will Be Suppressed

Wang has also moved to suppress his pre-Miranda statement.  As noted above, Wang was discovered hiding in his closet during the agents' safety sweep of the apartment. (June 21, 2011 Tr. 9-10, 22-25)  After the two agents who discovered Wang escorted him into the living room, Agent Thompson asked Wang, "What were you doing, why were you hiding?" (Id. at 10-11, 26-28)  Wang responded, "When I heard agents outside yell FBI, I knew I was in a lot of trouble, so I hid."  (Id. at 11)  Miranda warnings had not been administered when Wang made this statement.  (Id. at 26-27)

The Government does not dispute that Wang was in custody at the time he made the pre-Miranda statement.  (Govt. Post-Hr'g Br. 14)  The Government argues, however, that Agent Thompson's

inquiry was permissible under the public safety exception in light of the context. As . . . Agent Thompson testified, he asked the question out of a concern for safety. . . . Agent Thompson's inquiry was narrow in scope and directed at obtaining the defendant's explanation for being in the location where he was found as well as whether there were any weapons in the apartment.

(Id. at 15)  The Government contends that

the question was clearly not designed to elicit any facts relating to the case or to the defendant's involvement in the offense, and was patently not investigatory; the answer it did elicit . . . is arguably inculpatory, at least in a general way, in that it tends to show consciousness of guilt, but it does not implicate the defendant in any specific criminal conduct.

(Id. at 16)

Wang counters that "there was no 'immediate danger' to the agents or to the public.  The agents had completed a security sweep of the apartment, had found the defendant, and had him in custody."  (Def. Post-Hr'g Br. 4)  Wang notes that "[t]he defendant's family was already out of the apartment.  There was no suggestion, and certainly no evidence in the record, that other people might be in the apartment or that dangerous weapons or devices might be at hand."  (Id.)  Wang further argues that Agent Thompson's question

did not "relate to" any potential danger. . . . [T]he agent was not asking about the whereabouts of a gun or other dangerous device.  Instead, he asked the defendant why he had been hiding – a question that related to an event that was already in the past, and which had nothing to do with any present or threatened danger to the agents.

(Id.)

In support of its public safety exception argument, the Government cites United States v. Newton, 369 F.3d 659 (2d Cir. 2004), United States v. Estrada, 430 F.3d 606 (2d Cir. 2005), and United States v. Reyes, 353 F.3d 148 (2d Cir. 2003).  In Newton, the defendant's mother had recently reported that the defendant had a firearm in his home and had threatened to kill her and her husband.  Newton, 369 F.3d at 678.  When officers arrived to search the

16

defendant's apartment, they asked him – prior to administering <u>Miranda</u> warnings – whether he

had any contraband, and the defendant motioned toward a nearby table and answered "only what

is in the box."  Officers then recovered a firearm and ammunition from the box.  <u>Id.</u> at 663-64.

The Second Circuit held that this statement was properly admitted under the public safety

exception to <u>Miranda</u>, because the officers had an "objectively reasonable belief that [defendant]

was dangerous, that he and his family were involved in a volatile domestic dispute, and that,

until the gun was found, there was a serious and immediate risk of harm to anyone in the

apartment."  <u>Id.</u> at 678.

    Likewise, in <u>Estrada</u>, the arresting officers knew that the defendant had been

convicted of misdemeanor and felony assault, and had been told that he was involved in a major

drug trafficking operation and had drugs in his apartment.  <u>Estrada</u>, 430 F.3d at 612-13.  During

the arrest and before <u>Miranda</u> warnings had been administered, an officer asked the defendant

whether there were any weapons in the apartment.  The defendant responded that he had a gun in

his jacket, and officers then recovered that firearm.  <u>Id.</u> at 608-09.  The Second Circuit held that

that the defendant's statement was properly admitted under the public safety exception because

"the arresting officers had an objectively reasonable need to protect themselves from immediate

danger," given the defendant's prior history of violence, the officers' reasonable belief that the

defendant had drugs and a firearm in the apartment, and the presence of another person in the

apartment, which "contributed to and compounded the threat the officers faced."  <u>Id.</u> at 613.

    Finally, in <u>Reyes</u>, before administering <u>Miranda</u> warnings, the arresting officer

asked the defendant – "a known narcotics dealer" – "if he had anything on him that [could] hurt

[the officer] or anyone on [the] field team."  <u>Reyes</u>, 353 F.3d at 151 (alterations in original).

After the defendant indicated that he had a gun in his pocket, and the officer removed it, the

officer again asked whether Reyes had anything in his pocket that "could hurt" the officer.  Id.

The defendant stated that he had drugs in his car.  The Second Circuit held that these statements

were admissible under the public safety exception, because "the arresting officer was reasonably

prompted by a concern for officer safety and that the questioning was not designed solely to

elicit testimonial evidence."  Id. at 155 (internal quotations omitted).

These cases are easily distinguished.  As an initial matter, the agents here had no

reason to suspect that Wang possessed a firearm or other weapon, or that he would be violent.

Moreover, all other occupants of the apartment had left before Agent Thompson asked Wang

why he had been hiding.  The agent's question was also highly likely to elicit an incriminating

response.

Under these circumstances, the Government has not satisfied its burden of

proving that the public safety exception applies.  See United States v. Zubiate, No. 08-CR-507

(JG), 2009 WL 483199, at *8 (E.D.N.Y. Feb. 25, 2009) ("Statements made in response to the

agents' pre-Miranda questions are suppressed because they do not fall within the public safety

exception. . . .  [T]here is no evidence that the agents possessed any specific knowledge, based

on either the circumstances of the criminal conduct or previous reports, that their safety or the

safety of the public was at issue, or that [defendant] possessed a firearm or other weapon.");

United States v. Cherino, 418 F. Supp. 2d 93, 95 (E.D.N.Y. 2005) ("Common to both Quarles

and Reyes was the legitimately harbored belief by law enforcement that the defendant had a

firearm, either immediately prior to his apprehension or simultaneously therewith, and that such

firearm represented a danger either to the public and/or the police.  In contrast, here, unlike in

Quarles, the arrest site was a private apartment which could have been readily secured, the

possibility of an accomplice had already been dispelled via a lengthy search, and the officers had

18

no reason to believe that there was an unaccounted for firearm in the immediate vicinity.  And unlike in <u>Reyes</u>, defendant here was handcuffed in the presence of several officers and, again, none of the officers had any reason to believe there was an undiscovered firearm.").  Wang's motion to suppress his pre-<u>Miranda</u> statement will be granted.

## II.    WANG'S MOTION TO DISMISS
##         <u>COUNT ONE OF THE INDICTMENT</u>

Wang argues that Count One of the Indictment– which charges him with advertising child pornography in violation of 18 U.S.C. § 2251(d) – must be dismissed because (1) Count One fails to state an offense; (2) Section 2251(d)(1) is unconstitutionally vague; and (3) Section 2251(d)(1) is ambiguous, and  the "rule of lenity" requires that the charge brought under this statute be dismissed.

Section 2251(d)(1) states:

> Any person who, in a circumstance described in paragraph (2) [of Section 2251(d)], knowingly makes, prints, or publishes, or causes to be made, printed, or published, any notice or advertisement seeking or offering – (A) to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct . . .  shall be punished as provided in [Section 2251] (e).

18 U.S.C. § 2251(d)(1).

Section 2251(d)(2) provides that

> [t]he circumstance referred to in paragraph (1) is that – (A) such person knows or has reason to know that such notice or advertisement will be transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mailed; or (B) such notice or advertisement is transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mailed.

18 U.S.C. § 2251(d)(2).

The Government argues that "Wang advertised that his websites distributed and displayed child pornography in two ways:  (1) through the name of one of his websites, 'Empire of the Young and Innocent Fragrances' (translated from the Chinese); and (2) through the names of many of the internal links on his websites."  (Govt. Post-Hr'g Br. 20 (citing Indictment ¶ 3))

### A.      <u>The Indictment is Legally Sufficient</u>

Fed. R. Crim. P. 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  "Typically, to state an offense, an indictment 'need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state time and place in approximate terms.'"  <u>United States v. Frias</u>, 521 F.3d 229, 235 (2d Cir. 2008) (quoting <u>United States v. Flaharty</u>, 295 F.3d 182, 198 (2d Cir. 2002)).

Here, Count One tracks the statutory language of Section 2251(d)(1) <u>in haec verba</u>.  (Indictment ¶ 5)  Wang nevertheless argues that Count One does not actually allege the advertising of child pornography.  (Greenberg Aff. ¶ 9; Def. Reply Br. 2-3)  Wang maintains that the "to wit" clause of Count One, which charges that Wang "maintained and operated websites that contained advertisements for the display and reproduction of images of child pornography over the Internet," does not sufficiently allege a violation of Section 2251(d).  Wang contends that the "to wit" clause does not encompass the Government's theory that the name of Wang's website was, in itself, an advertisement for child pornography, and further argues that "internal links [to child pornography on Wang's websites] do not meet the common definition of 'advertising.'"  (Greenberg Aff. ¶ 11; Def. Reply Br. 5)  Finally, Wang contends that the allegations in Count One do not satisfy the "transportation" element of Section 2251(d)(2).  (Def. Reply Br. 5-6)

20

1.       **The "To Wit" Clause Encompasses the Name of the Website**

Wang contends that

the "to wit" clause of the advertising count does not encompass the names of the web sites.  The text of the "to wit" clause states that the alleged advertisements were "contained" in the web sites:  i.e., that they were [an] integral part of the sites rather than mere titles thereof.  As such, the indictment cannot be construed to include the names of the web sites without effectuating a constructive amendment, which this Court may not do.

(Def. Reply Br. 5)

The Government argues that "Wang is simply wrong in contending that the name of one of his websites is not properly encompassed by the language in the 'to wit' clause and that the Government's proof of such would constitute a constructive amendment to the Indictment." (Govt. Post-Hr'g Br. 20)  The Government notes that "[t]he Indictment alleges that Wang's websites <u>contained</u> numerous advertisements for child pornography; the Government's evidence would prove that one of them contained an advertisement for child pornography in its very name."  (<u>Id.</u>)  The Government further maintains that "[t]he language in the 'to wit' clause – specifically the word 'contained' which seems to be Wang's issue – is logically read to include both the names of the internal links on the websites and the name of one of the websites, both ways in which the defendant advertised child pornography."  (<u>Id.</u>)  The Court agrees that Wang's reading of the "to wit" clause – and, in particular, of the word "contained" – is too restrictive.

In <u>United States v. D'Amelio</u>, 683 F.3d 412 (2d Cir. 2012), the Second Circuit addressed the significance of a "to wit" clause in a context in which the defendant argued that the district court's jury charge constituted an impermissible amendment of the indictment.  The defendant was charged with attempted enticement of a minor for the purpose of engaging in sexual activity in violation of 18 U.S.C. § 2422(b).  <u>D'Amelio</u>, 683 F.3d at 414.  The Government had introduced evidence of telephone conversations between the defendant and the

21

minor, even though the "to wit" clause of the indictment alleged only that the defendant used a

computer and the Internet to perpetrate the offense.  Id. at 414-15.

      The court set forth the applicable standard for an impermissible constructive

amendment:

> [t]o prevail on a constructive amendment claim, a defendant must demonstrate
> that "the terms of the indictment are in effect altered by the presentation of
> evidence and jury instructions which so modify essential elements of the offense
> charged that there is a substantial likelihood that the defendant may have been
> convicted of an offense other than that charged in the indictment."

Id. at 416 (quoting United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988)) (emphasis added

in D'Amelio).  The court noted that "it has '"consistently permitted significant flexibility in

proof, provided that the defendant was given notice of the core of criminality to be proven at

trial."'"  Id. at 417 (quoting United States v. Rigas, 490 F.3d 208, 228 (2d Cir. 2007) (quoting

United States v. Patino, 962 F.2d 263, 266 (2d Cir. 1992)) (emphasis added in Rigas).  The court

emphasized that "[t]he 'core of criminality' of an offense involves the essence of a crime, in

general terms; the particulars of how a defendant effectuated the crime falls outside that

purview."  Id. at 418.

      Courts considering a constructive amendment claim must determine whether a

jury convicted, or could convict,

> based "on a complex of facts distinctly different from that which the grand jury
> set forth in the indictment," or whether the indictment charged a single set of
> discrete facts from which the government's proof was at most a non-prejudicial
> variance.  If the latter, [the Second Circuit] has generally concluded that the
> indictment provides sufficient notice to defendants of the charge(s) lodged against
> them.

Id. at 419 (citations omitted).

Applying this law to the facts of <u>D'Amelio</u>, the Second Circuit found that

> the charged offense took place "as part of a single course of conduct."  That
> course of conduct by [the defendant] took place within the discrete time period of
> August 2004 through September 2004.  The course of conduct had a single,
> ultimate purpose (its "core of criminality") – to entice [the minor] . . . "into a
> position where she could become the victim of a sexual predator."

<u>Id.</u> at 421.  The court further found that "the 'core of criminality' for this crime did not

encompass a specific facility and a specific means of interstate commerce employed by [the

defendant] in connection with the crime."  <u>Id.</u>  Accordingly,

> the government's proof at trial did not modify an "essential element" of the
> alleged crime.  The essential element at issue is [the defendant's] use of a "facility
> or means of interstate . . . commerce," not the particular means that were used. . . .
> Whether [the defendant] used the Internet or a telephone makes no difference
> under the relevant statute. . . .

<u>Id.</u> at 422 (quoting 18 U.S.C. § 2422(b)).  Therefore, the indictment gave the defendant sufficient

notice of the core criminal conduct for which he was charged.  <u>Id.</u>

Here, even if the "to wit" clause could be read to include only the names of the

internal links on Wang's websites, rather than the names of the websites themselves – because of

the use of the word "contained" –  the purpose of Wang's alleged conduct – its "core of

criminality" – was to advertise the availability of child pornography.  That course of conduct

likewise took place within a discrete time period – 2007 through June 2011.  (Indictment ¶ 5)

Whether Wang advertised the availability of child pornography through the name of his websites

or through names of links on his websites "makes no difference under the relevant statute. . . ."

<u>D'Amelio</u>, 683 F.3d at 422.  Moreover, the Government's evidence that Wang's title for one of

his websites was in itself an advertisement for child pornography cannot be said to "modify an

'essential element' of the alleged crime."  Id.[2]

Accordingly, the Court rejects Wang's argument that the Government has

effected a constructive amendment of the Indictment by claiming that liability on Count One can

be premised on a finding that the name of one of Wang's websites is an advertisement for child

pornography.[3]

---

[2] Wang's attempts to distinguish D'Amelio are not persuasive.  Wang argues that, unlike in
D'Amelio, here "it cannot be said that the additional conduct that the Government wishes to
engraft onto the indictment . . . is part of the same unified and ongoing course of conduct as the
behavior already alleged in the indictment's 'to wit clause.'"  (Def. Post-Hearing Br. 9)  Wang
argues that "[t]he indictment does not allege, and the Government has not proven, that the web
site was named by the same person who put in the links, that the naming and links were part of
an organized campaign, or that acts occurred close together in time in a way that would suggest
that they are part of a single ongoing transaction."  (Id.)  The issue at this stage is not whether the
Government can prove the charged offense at trial, however, but rather whether the Government
has sufficiently alleged the advertising of child pornography.  In any event, given that one of
Wang's websites has a title that is alleged to be an advertisement for child pornography, and that
the names for links in Wang's websites also allegedly advertise the availability of child
pornography, it would not require a leap of logic for a jury to find that the website name and the
names of the links are part of an "organized campaign" by Wang to advertise and profit from
child pornography.

[3] Wang argues that "even assuming arguendo that an expansion of the advertising count to
include the name of the web site would be permissible at this juncture, such an expansion would
be futile because the name of the web site is clearly not an advertisement for child pornography
within the meaning of the statute. . . .  Naturally, the fact that something is 'related to young
children' does not in itself mean child pornography."  (Def. Post-Hearing Br. 10)  The
Government argues, however, that "the Chinese characters at the beginning of the website name,
written as 'UU' in English, signify, in substance, 'young, under age' or 'a child, children' and
thus provide notice that child pornography can be found on the website."  (Govt. Opp. Br. 12-13)
The parties' contradictory arguments present a factual issue that a jury must resolve.

It is worth noting, however, that a conviction under Section 2251(d) does not require
proof that a defendant used the words "child pornography" or was otherwise explicit.  "'[T]here
is no requirement that an advertisement must specifically state that it offers or seeks a visual
depiction to violate [Section 2251(d)]. . . .  [N]o particular magic words or phrases need to be
included.'"  United States v. Rowe, 414 F.3d 271, 277 (2d Cir. 2005) (quoting United States v.
Pabon–Cruz, 255 F. Supp. 2d 200, 218 (S.D.N.Y. 2003) (quoting jury charge)); see also United
States v. Christie, 570 F. Supp. 2d 657, 666 (D.N.J. 2008) ("A notice and advertisement need not
be explicit itself, for to hold such would be to encourage the proliferation of child pornography
so long as it is done in a 'subtle' manner by merely posting on a password-protected website

2.      __The Website Links Meet the Common Definition of Advertising__

Wang also argues that Count One does not sufficiently allege advertising, because the links on Wang's websites "do not meet the common definition of 'advertising.'"  (Greenberg Aff. ¶ 11)  Wang maintains that "an advertisement for child pornography must reach out to consumers who do not know that child pornography is on a certain web site and make them aware that the site contains child pornography."  (Def. Reply Br. 7)  Wang further argues that the links on Wang's websites "do not 'make generally known,' to those who would not otherwise know, that child pornography exists on the sites.  By the time any user might see these links, he would have already arrived at the site and would be fully aware that child pornography exists therein."  (Id. at 8)  According to Wang, the links "simply <u>instructed</u> people who were <u>already</u> aware of the child pornography as to how to access it."  (Def. Post-Hr'g Br. 13)

The Indictment charges that the links on Wang's websites "advertised and offered access to child pornography collected under descriptive titles. . . ."  (Indictment ¶ 3)  The Indictment further alleges that in order to access these child pornography forums, "an individual was required to (i) purchase a 'V.I.P. membership,' or (ii) acquire 'points' either by making monetary payments or by posting pornography, including child pornography, to the Websites." (<u>Id.</u> ¶ 2)

The task of statutory construction begins, of course, with the plain language of the statute.  <u>See</u>, <u>e.g.</u>, <u>United States v. Santos</u>, 541 F.3d 63, 67 (2d Cir. 2008) ("[A]lthough [the defendant] argues that his position is supported by the legislative history of section 848(e)(1)(A) and the principles of statutory construction favoring a narrow interpretation of criminal statutes,

---

dedicated to child pornography a direct link to a prohibited video.  Accordingly, this Court holds that a non-descriptive link to an image or video of child pornography satisfies the notice and advertisement element of 18 U.S.C. § 2251.").

we need not resort to these modes of interpretation if the plain language of the statute is clear.")

(citing <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992); <u>Davis v. Mich. Dep't of</u>

<u>Treasury</u>, 489 U.S. 803, 808 n.3 (1989); <u>Cohen v. JP Morgan Chase & Co.</u>, 498 F.3d 111, 116

(2d Cir. 2007); <u>Gottlieb v. Carnival Corp.</u>, 436 F.3d 335, 337-38 (2d Cir. 2006)); <u>Peralta-Taveras</u>

<u>v. Att'y Gen.</u>, 488 F.3d 580, 584 (2d Cir. 2007) ("[T]he well-established rules of statutory

construction . . . instruct that our inquiry begins with the plain language of the statute and 'where

the statutory language provides a clear answer, it ends there as well.'") (quoting <u>Hughes Aircraft</u>

<u>Co. v. Jacobson</u>, 525 U.S. 432, 438 (1999)).

The Merriam-Webster dictionary defines "advertisement" as

1.  the act or process of advertising

2.  a public notice; <u>especially</u> one published in the press or broadcast over the air

MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/advertisement (last visited

January 30, 2013).

"Advertise" is defined as follows:

1.  to make something known to:  notify

2.  a.  to make publicly and generally known . . .
    b.  to announce publicly especially by a printed notice or a broadcast
    c.  to call public attention to especially by emphasizing desirable qualities so
        as to arouse a desire to buy or patronize:  promote

MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/advertise (last visited January

30, 2013).

"Notice" is defined as:

1.  a.  (1) warning or intimation of something:  announcement; (2) the
        announcement of a party's intention to quit an agreement or relation at a
        specified time; (3) the condition of being warned or notified – usually used in
        the phrase <u>on notice</u>
    b.  information; intelligence

26

    2.  a.  attention, heed
          b.  polite or favorable attention:  civility

    3.  a written or printed announcement

    4.  a short critical account or review

MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/notice (last visited January 30, 2013).

        Applying these common meanings of "advertisement," "advertise," and "notice," a reasonable jury could find that the links on Wang's websites (1) "called attention" to the location within Wang's websites where customers could access child pornography; and (2) were designed to induce those viewing the websites to purchase – either through monetary payment or through posting additional pornography – access to the child pornography contained therein.

        As an initial matter, a reasonable jury could find that Wang must have known that the material on his websites could be transmitted to any member of the public with access to the Internet.  See United States v. Allamon, No. 04 CR. 1231 JSR, 2005 WL 2542905, at *3 (S.D.N.Y. Oct. 11, 2005) ("Here . . . the defendants 'must have known or contemplated that [their website] would be transmitted . . . to anyone the whole world over.'") (quoting United States v. Rowe, 414 F.3d 271, 279 (2d Cir. 2005) (alterations in Allamon).  Moreover, as noted above, ordinary membership in the websites was not sufficient to obtain access to the child pornography forums.  The Indictment alleges that Wang used the descriptive titles of the links to induce customers to purchase a "VIP membership," or to acquire "points" by making monetary payments or by posting adult or child pornography to the websites, in order to access the child pornography content.  The links called attention to the availability of child pornography and

"arouse[d] a desire to buy" access to this material.  The links on Wang's websites thus meet the

ordinary meanings of "advertisement," "advertise," and "notice."

### 3.     Internal Links May Satisfy the "Transportation" Requirement of Section 2251(d)(2)

As noted above, the Government contends that Wang advertised that his websites

contained child pornography in two ways:  (1) through the name of the website; and (2) through

the names of many of the internal links on his websites.  (Govt. Post-Hr'g Br. 20) (citing

Indictment ¶ 3)  The Indictment charges that

> [o]ne of the Websites was called "Empire of the Young and Innocent Fragrances"
> (translated from Chinese).  The Websites's links advertised and offered access to
> child pornography collected under descriptive titles, such as "Young Young
> Empire," "Young Girl Beauty Photos Military Region," "Young Boy Movie
> Zone," and "Exclusive Quality Young Girl Photos Set."

(Indictment ¶ 3)

Section 2251(d)(2) provides that the notice or advertisement must be "<u>transported</u>

using any means or facility of interstate or foreign commerce or in or affecting interstate or

foreign commerce by any means including by computer or mailed."  18 U.S.C. § 2251(d)(2).

Wang argues that "[b]y requiring 'transportation,' Section 2251(d)(2) is intended to encompass

advertisements which are broadcast to the public or some section of the public by means such as

emails or chat rooms. . . ."  (Def. Reply Br. 6)  Wang further contends that here, "[t]he name of a

web site is not 'transported' anywhere, by computer or otherwise; instead, it exists at a fixed

location."  (<u>Id.</u>)  With respect to the internal links on his websites, Wang argues that "[l]ike the

title of the web site – and unlike chat room postings or emails – these links are not 'transported'

anywhere but instead reside at a fixed location."  (<u>Id.</u> at 8)  Wang further maintains that the

internal links

> do not "make generally known," to those who would not otherwise know, that
> child pornography exists on the sites.  By the time any user might see these links,
> he would have already arrived at the site and would be fully aware that child
> pornography exists therein.  The links merely provide more specific directions
> concerning how to access that child pornography.

(Id.)

The Government argues that the internal links on Wang's websites "provide notice to the viewer of where one can find child pornography on the websites."  (Govt. Opp. Br. 13)  The Government further contends that "the display of internal links to child pornography on defendant's websites is not substantially different in kind from the transmission of a link to child pornography in a chat room directed at people looking for child pornography that has consistently been held to constitute advertisement."  (Id. at 19)

The word "transported" is not defined in Section 2251(d)(2).  The Second Circuit has stated, however, that

> the statute requires that violators knew or had reason to know that their notice or
> advertisement would be "transported in interstate or foreign commerce by any
> means including by computer or mailed . . . or simply that the notice or
> advertisement was in fact so transported. . . . Section 2251(c)'s "conduct
> constituting the offense" is thus the publication of an offer, expected to be or
> actually communicated across state lines, to provide, receive or exchange child
> pornography.

Rowe, 414 at 278.  The court thus read "transported" to mean "communicated."  Accepting arguendo the Government's allegations that the website title and internal links communicate an offer to provide child pornography, Wang "knew or had reason to know" that that offer would be "communicated" worldwide when transmitted to customers over the internet.

The Rowe court also acknowledged that the defendant's "act of publishing an internet advertisement to trade child pornography can readily be described as an 'offense involving . . . transportation in interstate . . . commerce.'"  Rowe, 414 F.3d at 279 (quoting 18

U.S.C. § 3237(a)).  While this observation was made in the context of deciding whether the district court had venue under Section 3237(a), the court had little difficulty in concluding – for purposes of determining venue – that posting an offer to provide child pornography on the internet is an act involving "transportation in interstate commerce."

Other circuits have found – in the context of child pornography statutes – that internet transmission is sufficient to satisfy the interstate commerce element.  See, e.g., United States v. Runyan, 290 F.3d 223, 239 (5th Cir. 2002) ("As [defendant] notes, this circuit has not yet decided whether an Internet transmission, in and of itself, constitutes interstate transportation sufficient to satisfy the interstate commerce element of § 2251 (i.e., the element requiring that an offender must 'know[ ] or ha[ve] reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed'). . . . We join the First Circuit in holding that '[t]ransmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes transportation in interstate commerce' for the purposes of 18 U.S.C. § 2251.") (quoting United States v. Carroll, 105 F.3d 740, 742 (1st Cir. 1997) (alterations in Runyan); see also United States v. MacEwan, 445 F.3d 237, 246 (3d Cir. 2006) ("At trial, [defendant] stipulated that he downloaded from the Internet the child pornography images that were the subject of his conviction for Count Two of the indictment.  Accordingly, in light of our conclusion that the government is not required to prove that the child pornography images crossed state lines before being downloaded and received by the defendant, but rather only must prove that the images were downloaded from the Internet, which is properly regulated by Congress as a channel and instrumentality of interstate commerce, it is beyond doubt that the government proved that [defendant] satisfied the jurisdictional element of § 2252A(a)(2)(B).").  Although these cases address distribution of child pornography over the internet rather than

advertisement of child pornography, they are nevertheless instructive.  "[B]ecause of the very interstate nature of the Internet," MacEwan, 445 F.3d at 244, the Court finds that the transportation in interstate or foreign commerce element of Section 2251(d) may be satisfied by proof that the defendant "knew or has reason to know" that the "notice or advertisement" would be transmitted, or communicated, over the internet.

In so holding, the Court rejects Wang's argument that Section 2251(d) only reaches individuals who transmit links to child pornography sites via chat rooms or email.  (See Greenberg Aff. ¶ 17.)  As an initial matter, nothing in Section 2251(d) suggests that Congress only intended to prohibit child pornography advertisements offered via chat rooms or email, and given the role of the internet in disseminating child pornography, any such limitation would be absurd.  Moreover, courts have imposed liability under Section 2251(d) for conduct not involving chat rooms or email.  For example, in United States v. Sewell, 513 F.3d 820 (8th Cir. 2008), the defendant allegedly used Kazaa, a computer file-sharing service, to post a notice offering to distribute child pornography.  513 F.3d at 821.  The Eighth Circuit had no difficulty in concluding that "[i]n the context of the [file-sharing] program, placing a file in a shared folder with descriptive text is clearly an offer to distribute the file."  Id. at 822.  The court noted that

> [i]n chat rooms, the distributor of child pornography describes the content that he is willing to share by using words that are viewable by other users in the chat room, and he posts instructions on how to access the distributor's server and download the content. . . . [The file-sharing program] simply makes this process more efficient:  the description of the offered content is attached to each file and is searchable using [the program], and there is no need for instructions on server access because [the program] simplifies the downloading process to the click of a button.

Id. at 822; see also United States v. Meiners, 485 F.3d 1211 (9th Cir. 2007) (upholding sentence of defendant who operated a child pornography "file server" – a computer with a large amount of

disk capacity used for storing files on a computer network – and was convicted of advertising child pornography).

In sum, Wang is alleged to have, inter alia, created a website on the internet with a title indicating that the website contained child pornography.  Individuals using a search engine to locate child pornography on the internet would thus be directed to Wang's website as a result of the title he selected.  Accepting these allegations as true, the title of Wang's website functioned as a notice or advertisement offering access to child pornography within the meaning of Section 2251(d).  Finally – as noted above – the Court concludes that the statute's "transported in interstate commerce" requirement may be satisfied by proof that the defendant "knew or ha[d] reason to know" that the "notice or advertisement" would be transmitted, or communicated, over the internet.

**B.      Section 2251(d) Is Not Unconstitutionally
          Vague As Applied to Wang's Conduct**

Wang argues that Section 2251(d) "is [un]constitutionally vague, as applied to the facts of this case, for the same reasons that [Count One of] the Indictment fails to be legally sufficient."  (Greenberg Aff. ¶ 22).  Wang complains that, "[u]nder the Government['s] interpretation, every link on a web page to another page on that very website would constitute an 'advertisement' [by] the website['s] owner even though the person is already viewing that website."  (Id.)  According to Wang, "a person would not 'reasonably understand' that such conduct, i.e., a link leading to . . . internal pages, is an advertisement for that internal page."  (Id. ¶ 23)  Wang argues that "ambiguity" concerning the definition of "advertisement" in the statute supports application of the rule of lenity.

"'As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what

conduct is prohibited and in a manner that does not encourage arbitrary or discriminatory

enforcement.'" United States v. Morrison, 686 F.3d 94, 103 (2d Cir. 2012) (quoting Kolender v.

Lawson, 461 U.S. 352, 357 (1983)); see also United States v. Gagliardi, 506 F.3d 140, 147 (2d

Cir. 2007) ("A penal statute is not void for vagueness if it defines the offense (1) 'with sufficient

definiteness that ordinary people can understand what conduct is prohibited' and (2) 'in a manner

that does not encourage arbitrary and discriminatory enforcement.'") (quoting Kolender, 461

U.S. at 357).

     "This test does not demand meticulous specificity in the identification of

proscribed conduct. Rather, it requires only that the statutory language conveys sufficiently

definite warning as to the proscribed conduct when measured by common understanding and

practices." United States v. Farhane, 634 F.3d 127, 139 (2d Cir. 2011) (internal quotations and

citations omitted). "Additionally, '[v]agueness challenges to statutes not threatening First

Amendment interests are examined in light of the facts of the case at hand; the statute is judged

on an as-applied basis.'" United States v. Coppola, 671 F.3d 220, 235 (2d Cir. 2012) (quoting

Maynard v. Cartwright, 486 U.S. 356, 361 (1988)). "In an as-applied challenge, 'one whose

conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness.'"

United States v. Nadirashvili, 655 F.3d 114, 122 (2d Cir. 2011) (quoting United States v. Nadi,

996 F.2d 548, 550 (2d Cir. 1993)). Courts "will uphold a statute against an as-applied challenge

if '"the particular enforcement at issue [is] consistent with the core concerns underlying the

[statute]."'" Mannix v. Phillips, 619 F.3d 187, 197 (2d Cir. 2010) (quoting Dickerson v.

Napolitano, 604 F.3d 732, 748 (2d Cir. 2010) (quoting Farrell v. Burke, 449 F.3d 470, 493 (2d

Cir. 2006))) (alterations in Mannix).

Because Wang's as-applied vagueness argument tracks his claim that Count One is insufficient, his vagueness challenge fails for the same reasons that his insufficiency claim fails. For the reasons discussed above, the Court finds that Wang's conduct falls within the scope of Section 2251(d). Applying the usual meaning of the words "advertisement" and "notice," the descriptive links on Wang's websites – as well as the name of the uudiguo website – constitute advertisements and/or notices offering child pornography. Although not defined in Section 2251(d), "advertisement" and "notice" "are words of common usage that have plain and ordinary meanings." Gagliardi, 506 F.3d at 147. The Court finds that these terms are "sufficiently definite that ordinary people using common sense could grasp the nature of the prohibited conduct." Id. Moreover, the application of Section 2251 to the facts at hand is "consistent with the core concerns underlying" Section 2251. Mannix, 619 F.3d at 197. Accordingly, the Court concludes that Section 2251(d) is not unconstitutionally vague as applied to Wang's conduct.

## CONCLUSION

Defendant's motion to suppress his pre-Miranda statement is granted, but his motion to suppress is otherwise denied. Defendant's motion to dismiss Count One of the Indictment is denied. The Clerk of Court is directed to terminate the motion. (Dkt. No. 24)

Dated: New York, New York
      February 5, 2013

SO ORDERED.

Paul G. Gardephe
United States District Judge